UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HERMIE FAJARDO,<br><br>       Plaintiff,<br><br> -against-<br><br>WOODY ALLEN, SOON-YI PREVIN, and<br>PAMELA STEIGMEYER, individually,<br><br>       Defendants. | **COMPLAINT**<br><br>**Civil Action No.:**<br><br>Jury Trial Demanded |

HERMIE FAJARDO ("Plaintiff"), by his attorneys, JOSEPH & NORINSBERG, LLC, as and for his Complaint against WOODY ALLEN ("Allen"), SOON-YI PREVIN ("Previn"), and PAMELA STEIGMEYER ("Steigmeyer"), individually ("Defendants"), alleges upon personal knowledge as to himself and his own actions and upon information and belief as to all other matters as follows:

**NATURE OF THE CASE**

1. Defendants Woody Allen, his spouse Soon-Yi Previn, and his private home manager, Pamela Steigmeyer, fired Plaintiff Hermie Fajardo - - Allen and Previn's personal private chef - - because of his active-duty United States Army Reserve status, and because he demanded to be paid fairly.

2. It was too much for Allen and Previn to accommodate his need for an extra day to complete a mandatory training exercise. Instead, Defendants became tired of Plaintiff's complaints about unpaid wages, and simply decided that a military professional who wanted to be paid fairly was not a good fit to work in the Allen home, violating federal and New York law in the process.

3. Accordingly, Plaintiff brings this civil action for monetary damages and equitable relief based upon violations that Defendants committed infringing on Plaintiff's rights guaranteed

to him by: (i) the Uniformed Services Employment and Reemployment Act of 1994, 38 U.S.C. §§ 4301-4335 ("USERRA"); (ii) Section 215, *et seq*, of the New York Labor Law ("NYLL"); (iii) the NYLL's whistleblower protection law, NYLL § 740; (iv) the NYLL's requirement that employers furnish employees with wage statements containing specific categories of accurate information on each payday, NYLL §195(3), as codified in the New York Wage Theft Prevention Act ("WTPA"); (v) the NYLL's requirement that employers furnish employees with a wage notice at hire containing specific categories of accurate information, NYLL § 195(1); and (vi) any other claim(s) that can be inferred from the facts set forth herein.

4.      As described below, fully aware that Plaintiff was on active military deployment, Defendants terminated his employment on the basis of Plaintiff's military status while Plaintiff was serving an approved military leave, and very shortly after Plaintiff informed Defendants that his military leave service had been extended by merely one additional day beyond its original schedule.

5.      Moreover, Defendants' termination of Plaintiff's employment while on active military deployment, also occurred immediately after Plaintiff had made repeated complaints to Defendants regarding his good faith belief as to Defendants' failure to properly withhold taxes from his pay, and due to underpayments of his regular gross wages, which too, played a motivating role in Defendants' desire and ultimate decision to terminate Plaintiff's employment in retaliation thereof, in violation of NYLL §§ 215 and 740.

6.      And adding literal insult to injury, after Plaintiff stood up for his rights by asserting his complaints through counsel, Defendants sheepishly began questioning Plaintiff's working capabilities as their chef, despite offering him effusive praise for his culinary prowess during his

employment, demonstrating pretext and proving Defendants' obvious discriminatory and retaliatory animus.

## JURISDICTION AND VENUE

7.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, as this action arises under 38 U.S.C. § 4323(b).

8.      The supplemental jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1367 over all claims arising under New York law.

9.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims for relief occurred within this judicial district.

## PARTIES

10.      At all relevant times herein, Plaintiff worked for Defendants in New York and was an "employee" entitled to the protections as defined in the USERRA, and the NYLL.

11.      Defendants Allen and Previn are natural persons residing within the State of New York, with a primary residence and place of business located in New York County.

12.      At all relevant times herein, Defendant Steigmeyer was and is a manager of all business operations for Defendants Allen and Previn at their primary residence and place of business located in New York County.

13.      At all relevant times herein, each of the Defendants were "employers" of Plaintiff pursuant to 38 U.S.C. § 4303(4)(A).

14.      Defendants were responsible for directly overseeing and exerting direct control over Plaintiff's work for Defendants.

15.     Defendants jointly shared in the power and authority to directly affect the quality of work conditions and employment of Plaintiff.

16.     Defendants jointly shared in the power and authority to hire new employees, and together hired Plaintiff to work for Defendants.

17.     Defendants jointly shared in the power and authority to fire or terminate employees of Defendants, and ultimately terminated Plaintiff's employment there.

18.     Defendants jointly shared in the power and authority to provided instructions and directions to Plaintiff on how and when to perform his job duties, and supervised the work that Plaintiff performed each day, specifically directing Plaintiff what dishes to cook, and in some instances directing him on how they liked them prepared to their specific, personal palates.

19.     Defendants jointly shared in the power and authority to set and established Plaintiff's rate of pay, and pay Plaintiff his owed wages.

20.     Defendants jointly shared in the power and authority to set, establish and determine Plaintiff's work hours and work schedule.

21.     Furthermore, Defendants are jointly responsible for maintaining all employment records of Defendants' employees, including, without limitation, any and all records relating to Plaintiff's hours worked and pay.

22.     Accordingly, at all relevant times hereto, Defendants were Plaintiff's "employer" within the meaning and the intent of the NYLL.

## **BACKGROUND FACTS**

23.     Plaintiff, of Philippine descent, is an active member of the United States Army Reserve, and has been in good standing since his enlistment in April 2021.

4

24.     Plaintiff is also an experienced culinary chef, with a Bachelor of Science Degree in Hotel and Restaurant Management, and a major in Culinary Arts, and nearly ten years of professional experience in preparing and cooking luxury dishes of all types.

***Defendants Hire Plaintiff After Effusive Praise During His "Trial Run" in the Allen Home***

25.     In or around January 2024, Plaintiff first sought employment with Defendants as Defendants Allen and Previn's private chef.

26.     In doing so, Plaintiff cooked luxury meals for Defendants, in what Defendants categorized as a part-time employment gig, or a "trial run."

27.     At that time, Plaintiff dutifully informed Defendants beforehand that he was serving our nation as a member of the United States Army Reserve, and that when employed, he would require periodic days off from work to travel and perform reserve duty work, as required by his commanding officer.

28.     During his "trial run," Plaintiff - - together with another former employee of Defendants who identified as "Chef Ruby" and whom Plaintiff would later replace - - prepared and cooked meals for Defendants and their eight guests, including, without limitation, Defendants' meal of choice, a salt-baked Bronzino, together with various side dishes, vegetables, and desserts.

29.     Upon completion of the meal, Defendants and their guests informed Plaintiff that they "loved it," and that they were impressed with Plaintiff's intricate cooking skills and abilities.

30.     In March 2024, as another part-time employment gig, Plaintiff and Chef Ruby again prepared and cooked similar fish-based meals for Defendants and their numerous guests, upon completion of which, yet again, Defendants and their guests reported only positive feedback to Plaintiff on his preparations, seasoning, and cooking talents.

31.    Impressed with Plaintiff's cooking skills, when Chef Ruby's employment with Defendants ended in or around April 2024, Chef Ruby and/or Defendants' longtime housekeeper, Ms. Nora, for whom Plaintiff also cooked meals, specifically referred Plaintiff to the Defendants for long-term employment based on Plaintiff's prior exceptional cooking performances, and Defendants' enjoyment and overwhelmingly positive feedback to Plaintiff.

32.    In seeking long-term employment with Defendants, on June 19, 2024, Plaintiff began yet another "one-day trial" with Defendants, during which, Plaintiff prepared and cooked a three-course meal featuring a full roasted chicken, chocolate cake, and fresh tomato sauce pasta, seasoned vegetables, and - - at the request of Defendant Allen - - an apple pie, for Defendants and their two guests.

33.    Again, upon Defendants' completion of their meal, Defendants and their guests showered Plaintiff with overwhelmingly positive feedback, and informed Plaintiff that, "we love your food."

34.    As a result, shortly thereafter on June 19, 2024, Defendant Steigmeyer informed Plaintiff that Defendants "love" Plaintiff, and his cooking abilities, and that Defendants would therefore be employing Plaintiff going forward as their private chef, on a full-time basis.

35.    Defendant Steigmeyer congratulated Plaintiff on his hiring, and discussed with Plaintiff the signing of his 'commencement documents', which included the need to "put you in their ADP system for payroll purposes."

***Plaintiff Immediately Experiences Problems Upon Hire***

36.    At the time of Plaintiff's hire, Plaintiff again reminded Defendants that he was actively serving as a member of the United States Army Reserve, and that he would require

periodic days off to travel and perform reserve duty work, as required by his commanding officer, which Defendants acknowledged and understood.

37.     Shortly thereafter on June 19, 2024, Plaintiff provided Defendant Steigmeyer with a copy of his annual service schedule, which outlined the remaining days during 2024 for which Plaintiff would be required days off to serve.

38.     In response to Plaintiff providing Defendants with his annual service schedule, Defendant Steigmeyer advised Plaintiff, "I got it," while assuring Plaintiff that he would be paid his salary, ***in full***, during days or weeks when Plaintiff would be required to perform his necessary military service.

39.     At the time of Plaintiff's hire, Defendants also informed Plaintiff that he would be a salaried worker, paid at a rate of $85,000.00 per annum.

40.     Upon completion of Plaintiff's first full-time week of work for Defendants – from June 24, 2024, through June 28, 2024 – Plaintiff received his pay in the gross amount of $1,634.62.

41.     However, to Plaintiff's surprise, Plaintiff still had not been put into Defendants' ADP payroll system, and instead, Defendants paid Plaintiff's first full week of wages by a bank-to-bank transfer, without any taxes withheld, and without providing Plaintiff with any paystub – a pay arrangement which Plaintiff did not consent to, and which violated the NYLL's Wage Theft Prevention Act.

42.     When Plaintiff later discovered that no taxes had been withheld from his pay, he promptly complained to Defendant Steigmeyer, who informed Plaintiff that she would need to speak to Defendant Allen about his pay issue, as Plaintiff "still needed to be put into the system."

43.     In response to Plaintiff's complaint about being paid by a bank-to-bank transfer without any taxes withheld, Defendant Steigmeyer assured Plaintiff that the issue relating to his

failed tax deduction would "be resolved by next week's pay" – a promise which Plaintiff would later learn was false.

44.    On June 30, 2024, after working for Defendants for almost two weeks, Plaintiff reminded Defendants, in accordance with his military service schedule which he provided Defendants at his time of hire, that he was scheduled for an upcoming mandatory drill in New Jersey, which would be taking place from July 11, 2024, through July 14, 2024.

45.    During the following days, Plaintiff continued to work for Defendants without any performance issues, while, as Plaintiff would later learn, Defendants still had not remedied the payroll issues relating to Plaintiff's wages.

46.    To Plaintiff's surprise, upon completion of Plaintiff's second week of work for Defendants, Defendants yet again paid Plaintiff in the gross amount of $1,634.62, via a bank-to-bank transfer without any taxes withheld, and again without providing Plaintiff with any paystub – despite Defendant Steigmeyer's assurances to Plaintiff that Defendants would ensure Plaintiff "be put into the system," and correct this wage issue by the next week's pay.

47.    As a result of Defendants' continued failure to follow through on their assurances to Plaintiff, and specifically, Defendants' failure to rectify these issues relating to the manner of Plaintiff's pay, Plaintiff was left with no option other than to continue to raise this issue, and complain again about being paid by bank-to-bank transfer and without any taxes withheld.

48.    As such, Plaintiff again promptly apprised Defendant Steigmeyer of this issue relating to Defendants' failure to deduct any taxes from his gross pay, and in response, Defendant Steigmeyer retorted to Plaintiff that he "still needed to be put into the system," and attempted to assuage Plaintiff that he "would be."

49.     During late June 2024, and early July 2024, Plaintiff continued to complain about Defendants' failure to withhold taxes from his gross wages, and Plaintiff's resulting issues relating to Defendants' failures, which issues Defendants continued to fail or refuse to rectify, remedy, or even explain to Plaintiff why it was taking so long to put Plaintiff into their ADP payroll system.

50.     On one such workday during early July 2024, when Plaintiff approached Defendant Steigmeyer seeking clarification and resolution on the wage-related issue, in response to Plaintiff's repeated complaints, Defendant Steigmeyer informed Plaintiff that he should direct his complaints to Defendants' staff accountant, who would "resolve the issue."

51.     As Defendant Steigmeyer instructed, Plaintiff contacted Defendants' staff accountant, who simply reiterated the same response to Plaintiff, informing Plaintiff that, "they are having a hard time putting you into the system," and that, "it's going to take a lot of time."

52.     Despite Plaintiff's repeated best efforts to resolve his wage issue with Defendant Steigmeyer, and then with Defendants' staff accountant, Defendants failed to provide any clear explanation to Plaintiff as to how, why, or when, a resolution of his wage issues would be reached.

***Defendants Overtly Retaliate Against Plaintiff in Response to his Complaints and Due to His Military Service***

53.     Upon the successful completion of Plaintiff's third week of work for Defendants, Plaintiff received his third wage payment on July 12, 2024, via a direct deposit, while Plaintiff was engaging in his mandatory military service in New Jersey.

54.     However, while Plaintiff discovered that Defendants withheld taxes on the third payment of his gross wages, and therefore, believed that he appeared to have finally been "put into their payroll system" in resolution of his prior wage complaints, to Plaintiff's disbelief, Plaintiff now noticed a new issue relating to Defendants' payment of his wage – that his total salary paid

was in the gross amount of *$1,307.70* (before tax withholdings), an inexplicable downward adjustment of more than $300.00 to his base weekly wage.

55.     Plaintiff, puzzled and troubled in learning that he was not paid for all his wages earned for his third week of work, immediately contacted Defendant Steigmeyer by telephone to discuss the wage issue, and get clarification as to his wage underpayment.

56.     While Plaintiff was calm and respectful in his demeanor during the telephone call with Defendant Steigmeyer, and politely inquired as to why his gross pay was less than it should have been, in response, Defendant Steigmeyer raised her tone and was abrasive in response to Plaintiff's further wage complaints, informing Plaintiff, among other things, that he should, "chill" or "relax."

57.     Worse, rather than explaining or remedying the issue, Defendant Steigmeyer abrasively rebuked Plaintiff, while asserting, among other things, that if Plaintiff "keep[s] asking about this, I hope it will not affect your job in the future."

58.     Plaintiff was astonished at Defendant Steigmeyer's response to his good faith wage complaint, and attempted to de-escalate Defendant Steigmeyer's hostility, by clarifying that he was referring only to the amount of his *Gross Income*, which was short, rather than the prior issue relating to the failure to deduct taxes from his pay.

59.     Unmoved by Plaintiff's persistent wage complaints, Defendant Steigmeyer advised Plaintiff that, "if you don't like your deductions working here in NYC, you should go work in South Carolina."

60.     Unable to receive clarity, closure, or resolution from Defendants on his wage underpayment, Plaintiff texted Defendant Steigmeyer on July 12, 2024, to follow up with her as

to why his most recent salary paycheck was hundreds of dollars less than it should have been, which Plaintiff reasonably believed to be incorrect.

61.    In response, echoing a similar harsh tone, Defendant Steigmeyer texted Plaintiff back, responding, "I get it – but Taks, I can't do anything about that now. Let's talk about it on Monday," the day on which Plaintiff was scheduled to return to work.

62.    This conversation, however, never came to fruition, as Plaintiff would soon learn that his employment was coming to an end due to his wage complaints and military service.

63.    While Defendant Steigmeyer had acknowledged Plaintiff's wage underpayment during her discussions with Plaintiff while Plaintiff was performing his military service, and had informed Plaintiff that they would "speak about it on Monday," no such conversation ever materialized, however, as Defendants terminated Plaintiff's employment very shortly thereafter, before any conversation occurred.

***Defendants Terminate Plaintiff's Employment After his Need to Extend His Military Service***

64.    On July 13, 2024, while Plaintiff was completing his military service, he learned from his sergeant in an emergency meeting that his training would be extended for one (1) additional day, through the night of July 15, 2024 – the day Plaintiff was scheduled to return to work.

65.    As soon as his meeting was over, Plaintiff promptly contacted Defendant Previn to apprise, by text message, of his required extended military leave, and that he would therefore be returning to work for Defendants on July 16, 2024.

66.    While Plaintiff did in fact return to work for Defendants on July 16, 2024, he was immediately met with instant hostility and obvious resentment by Defendants.

67.    On the day Plaintiff returned to work, at approximately 9:30 a.m. during Plaintiff's shift, Plaintiff opened the door for Defendant Steigmeyer and told her "good morning" as Plaintiff always had done, but rather than responding to Plaintiff's greeting, Defendant Steigmeyer deliberately hurried upstairs directly past Plaintiff, without uttering any response.

68.    Fearing that his concerns would remain unaddressed, the next day on July 17, 2024, Plaintiff again attempted to address his unpaid wages with Defendant Steigmeyer, who again refused to greet Plaintiff, and refused to acknowledge or respond to him throughout his workday.

69.    Finally, on July 18, 2024, Plaintiff again greeted Defendant Steigmeyer upon her arrival, and this time promptly raised the issue of his underpayment.

70.    In response, Defendant Steigmeyer harshly informed Plaintiff that she "will deal with him later."

71.    Indeed, later that same day, shortly after Plaintiff finished preparing and cooking lunch for the Defendants, Defendant Previn asked Plaintiff if she "could speak to him privately."

72.    During this conversation, Defendant Previn informed Plaintiff that Defendants were terminating his employment, effective immediately.

73.    Utterly stunned, Plaintiff inquired whether the reason for Defendants' termination of his employment was in any way related to his army service.

74.     Defendant Previn refused to deny Plaintiff's fear, thereby confirming Defendants' unlawful retaliatory motive, as Defendant Previn simply replied, "thank you and good luck to you."

75.    Defendants' termination of Plaintiff's employment immediately upon Plaintiff's return to work from an extended military leave, was motivated by Plaintiff's military status, extended military service, as outlined above, and Plaintiff's exercise of his protected rights, in violation of USERRA.

76.     Additionally, Defendants' termination of Plaintiff's employment - - during and throughout this time period when Plaintiff made repeated good faith complaints about an underpayment of his wages - - was in direct retaliation for Plaintiff's repeated complaints about his wage issues and underpayments, in violation of the anti-retaliation protections of NYLL § 215.

77.     Finally, Defendants' termination of Plaintiff's employment - - after his repeated complaints about their failure to properly withhold taxes from his gross wages during the first two weeks of his employment in gross violation of the Internal Revenue Code and the New York Tax Code - - was in direct violation Plaintiff's rights to be free from retaliation as a whistleblower under NYLL § 740.

78.     Defendant Steigmeyer's sharp rebuke in her communications with Plaintiff while Plaintiff was on his approved military leave, and in response to Plaintiff's good faith inquiries about his taxes and gross wage underpayment, is proof of Defendants' retaliatory motive in their decision to terminate Plaintiff immediately upon his return to work.

79.     Defendants' repeated failure to cure Plaintiff's good faith belief of errors to his taxes, and later, as to his gross pay, necessitated Plaintiff continuing to press the issue, and only served to further stoke resentment of Plaintiff in the eyes of Defendants, and ultimately, played a substantial role in Defendants' desire to terminate Plaintiff's employment altogether.

80.     As set forth herein, Defendants unlawfully terminated Plaintiff's employment very shortly after his return from his protected military leave in retaliation thereof, and in retaliation for Plaintiff's repeated good faith complaints relating to issues and underpayments of his wages.

81.     And to add a final insult, after Plaintiff - - through counsel - - asserted his rights to be free from discrimination and retaliation, Defendants rubbed salt on the wounds it inflicted

against Plaintiff by denigrating his culinary abilities, claiming for the very first time that they terminated because Defendants Allen and Previn were unsatisfied with his cooking.

82.     This was, of course, false, as they and many of Defendants' guests had repeatedly praised Plaintiff's cooking over the course of his service in Defendants' home.

83.     Defendants' *ex post facto,* manufactured, and false explanation for their unlawful retaliatory actions amount to nothing more than shifting justifications for their decision to terminate Plaintiff's employment, amounting to manifest pretext and operating as a thinly veiled admission of their culpability.

84.     Defendant's unlawful acts of discrimination, retaliation, wage theft, and wrongful termination caused Plaintiff to suffer, and continue to suffer, monetary and economic damages as well as severe mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

## FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS
### *Failure to Accommodate and Wrongful Termination in Violation of the USERRA*

85.     Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

86.     Under USERRA § 4311(a), an employee "who is a member of . . . or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion or any benefit of employment by an employer on the basis of that membership . . . or obligation."

87.     Under USERRA § 4311(b), an "employer shall be considered to have denied . . . reemployment, retention in employment, promotion, or a benefit of employment, in violation of

this section, if the person's membership . . . service . . . or obligation for service in the uniformed

services is a motivating factor in the employer's action. . . ."

88.     As described above, each Defendant is an "employer" of Plaintiff within the

meaning and intent of USERRA, while Plaintiff is an "employee" within the meaning of USERRA.

89.     During all times relevant, Plaintiff performed all of his job duties for Defendants in

a satisfactory and laudable manner.

90.     As described above, Defendants terminated Plaintiff's employment immediately

following Plaintiff's return to work from Plaintiff's extended military leave.

91.     As described above, Defendants violated USERRA by terminating Plaintiff's

employment in a manner substantially motivated by Plaintiff's military service obligations.

92.     Defendants would not have terminated Plaintiff's employment in the absence of

Plaintiff's membership, performance of service, and obligation to perform his uniformed service.

93.     As a direct and proximate result of Defendants' unlawful, retaliatory, and

discriminatory conduct, including the termination of Plaintiff's employment, all in violation of

USERRA, Plaintiff has suffered, and continues to suffer, severe economic loss including loss of

earnings, for which Plaintiff is entitled to an award of monetary damages and other relief, as well

as monetary damages and other relief for mental anguish and emotional distress, including, but not

limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem or self-confidence,

and emotional pain and suffering, for which he is entitled to an award of monetary damages.

## SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS
### *Violation of the Anti-Retaliation Provisions of NYLL § 215(1)*

94.     Plaintiff repeats, reiterates, and realleges each and every allegation set forth above

with the same force and effect as if more fully set forth herein.

95.     New York Labor Law § 215(1) mandates that "No employer . . . shall discharge, threaten, penalize, or in any other manner discriminate against any employee because such employee has made a complaint to his employer . . . that the employer has violated any provision of this chapter [the Labor Law]."

96.     Defendants are "employers" within the meaning of the NYLL, while Plaintiff is Defendants' "employee" within the meaning of the NYLL.

97.     As described above, throughout Plaintiff's employment with Defendants, Plaintiff repeatedly raised and/or lodged several complaints with Defendants relating to issues with Defendants' payment of Plaintiff's wages, including, without limitation, Defendants' failure to deduct proper tax withholdings to Plaintiff's regular wages, and Defendants' failure to properly pay Plaintiff the full amounts of his owed wages.

98.     Plaintiff's complaints and inquiries to Defendants relating to issues with his pay were made in good faith, based on Plaintiff's good faith and sincere belief that he was not being paid properly.

99.     Plaintiff's repeated complaints to Defendants relating to issues with his pay constituted Plaintiff's engaging in protected activity pursuant to NYLL § 215.

100.    Despite Plaintiff repeatedly raising complaints with Defendants relating to issues with Defendants' payment of Plaintiff's wages, Defendants failed or refused to remedy Plaintiff's wage-related issues.

101.    As set forth above, Defendants instead retaliated against Plaintiff for engaging in protected activity, and in direct response to Plaintiff complaining of Defendants' wage violations, by, among other things, making derogatory remarks about Plaintiff, and terminating Plaintiff's employment shortly after Plaintiff's return to work from an extended military leave.

102.    These actions, among others, were in direct response to Plaintiff raising informal complaints against Defendants for their failure to pay him properly, or in full, in violation of NYLL § 215.

103.    The temporal proximity between Plaintiff's wage complaints and Defendants' aggressive or retaliatory behaviors evidence Defendants' retaliatory motives.

104.    As a direct and proximate result of Defendants' conduct in violation of the NYLL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, physical and emotional pain and suffering and loss of earnings for which he is entitled to an award of monetary damages and other relief.

### THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS
*Violations of the Anti-Retaliation Provisions under NYLL § 740*

105.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

106.    New York Labor Law § 740 prohibits employers from taking retaliatory action against an employee because such employee discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety, or which constitutes health care fraud.

107.    Defendants are "employers" within the meaning of the NYLL, while Plaintiff is Defendants' "employee" within the meaning of the NYLL.

108.    As set forth above, Defendants retaliated against Plaintiff for engaging in protected activity.

109.     Specifically, Defendants terminated Plaintiff's employment after he raised concerns and good faith complaints about Defendants' failure to withhold taxes from his gross wages during the first two weeks of his employment.

110.     The temporal proximity between Plaintiff's wage complaints and Defendants' aggressive or retaliatory behaviors evidence Defendants' retaliatory motives.

111.     Defendants' retaliatory actions against Plaintiff violated NYLL § 740.

112.     As a direct and proximate result of Defendants' conduct in violation of NYLL § 740, Plaintiff has suffered, and continues to suffer, damages including, but not limited to, lost past and future income, compensation, and benefits.

### FOURTH CLAIM FOR RELIEF AGAINST DEFENDANTS
*Failure to Furnish Accurate Wage Statements in Violation of the NYLL*

113.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

114.     Defendants are "employers" within the meaning of the NYLL, while Plaintiff is Defendants' "employee" within the meaning of the NYLL.

115.     N.Y. Lab. Law § 195(3) requires that employers furnish employees with wage statements containing accurate, specifically enumerated criteria on each occasion when the employer pays wages to the employee.

116.     Defendants, on each payday, failed to furnish Plaintiff with accurate wage statements containing all criteria required under the NYLL, specifically, NYLL § 195(1), *et seq*., and 12 NYCRR § 142-2.7, *et seq*.

117.     Specifically, Defendants failed to furnish Plaintiff with accurate wage statements on a weekly basis, and that if/when Defendants did furnish a wage statement, it failed to include,

*inter alia*, all of Plaintiff's owed and earned gross pay, his regular hours worked, corresponding regular rate of pay, and a correct pay period.

118.    Pursuant to NYLL § 198(1-d), Defendants are liable to Plaintiff in the amount of $250.00 for each workday that such violations occurred, up to a statutory cap of $5,000.00.

## FIFTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### *Failure to Furnish Proper Wage Notice in Violation of the NYLL*

119.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

120.    NYLL § 195(1) requires that employers provide employees with a wage notice at the time of hire containing accurate, specifically enumerated criteria.

121.    As described above, Defendants are "employers" within the meaning of the NYLL, while Plaintiff is Defendants' "employee" within the meaning of the NYLL.

122.    As also described above, Defendants failed to furnish Plaintiff with any wage notice at hire, let alone one that accurately contained all of the criteria required under the NYLL.

123.    Pursuant to NYLL § 198(1-b), Defendants are liable to Plaintiff in the amount of $50.00 for each workday after the violations initially occurred, up to a statutory cap of $5,000.00.

## DEMAND FOR A JURY TRIAL

124.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all claims in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

a.      A judgment declaring that the practices complained of herein are unlawful and in willful violation of the aforementioned federal and state laws;

b.      An order granting preliminary and permanent injunctions against Defendants and their officers, agents, successors, employees, representatives, and any and all persons acting in concert, from engaging in each of the unlawful practices, customs, and usages set forth herein;

c.      An award of damages in an amount to be determined at trial to compensate Plaintiff for all monetary and/or economic damages in connection with Plaintiff's claims, whether legal or equitable in nature, including back pay, front pay, and any other damages for lost compensation or employee benefits that Plaintiff would have received but for Defendants' unlawful conduct;

d.      An award of liquidated damages equal to the amount of economic damages suffered by Plaintiff as a result of the Defendant's willful violations of USERRA pursuant to 38 U.S.C. § 4323(d)(1)(C);

e.      An award of compensatory damages to Plaintiff for mental anguish, emotional distress, and humiliation, and damages caused to his personal and professional reputations for Defendants' violations of NYLL § 215;

f.      An award of statutory penalties and punitive damages commensurate with Defendants' ability to pay for their violations of NYLL § 740;

g.      An award to Plaintiff of reasonable attorneys' fees, as well as Plaintiff's costs and disbursements incurred in connection with this action, expert witness fees, and any other costs;

h.      An award of pre-judgment and post-judgment interest, as provided by law; and

      i.     Granting Plaintiff such other and further relief, including equitable relief, as this Court finds necessary and proper.

Dated:  New York, New York
          December 10, 2024

                              Respectfully submitted,

                              **JOSEPH & NORINSBERG, LLC**

By:                        
                              Jon L. Norinsberg, Esq.
                              Michael R. Minkoff, Esq.
                              Avraham Y. Scher, Esq.
                              110 East 59th Street, Suite 2300
                              New York, New York 10022
                              Tel.: (212) 227-5700
                              *Attorneys for Plaintiff*